IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIELLE NICOLE CANTERBURY, | ) | Case No. 5:22-cv-1741 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Danielle Nicole Canterbury, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Canterbury challenges the Administrative Law Judge's ("ALJ") negative findings, arguing that: (i) the ALJ erred in determining that her vasculitis impairment was not "severe"; (ii) the ALJ failed to address whether she met the criteria for Listing 14.03A; and (iii) the ALJ misevaluated the opinion evidence and her subjective symptom complaints.

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Canterbury's applications for DIB and SSI be affirmed.

## I.      Procedural History

In August 2020, Canterbury applied for DIB and SSI.  (Tr. 257, 264).[1]  Canterbury

alleged that she became disabled on May 7, 2018, due to: (i) depression; (ii) anxiety; and

(iii) cerebral vasculitis.  *See* (Tr. 257, 264, 302).  The Social Security Administration denied

Canterbury's applications initially and upon reconsideration.  (Tr. 111–26, 129–44).  Canterbury

requested an administrative hearing.  (Tr. 170).

On September 17, 2021, ALJ Michael Schmitz held an administrative hearing by

telephone but postponed the hearing without receiving testimony to arrange for a medical expert

witness.  (Tr. 96–108).  On December 13, 2021, ALJ Paula J. Goodrich heard Canterbury's case

telephonically and denied Canterbury's applications in a January 25, 2022 decision.  (Tr. 16–47,

53–95).  In so ruling, the ALJ determined that Canterbury had the residual functional capacity

("RFC") to perform light work, except that Canterbury:

- Can never climb ladders, ropes, or scaffolds but can frequently climb ramps
  and stairs, and can frequently stoop, crouch, kneel, and crawl;
- Can never work in exposure to hazardous machinery or unprotected heights;
  and
- Can perform simple, routine tasks in an environment that involves no high
  production quotas or fast-paced production demands and no tasks involving
  customer service duties, confrontation, conflict resolution including
  arbitration and negotiation, directing the work of others or persuading others,
  or tandem tasks, defined as tasks that would require the joint or cooperative
  effort of a coworker to complete them; and, if any changes in work place tasks
  or duties do occur, they would be few, occur only on occasion, and be
  gradually introduced.

(Tr. 27).  On August 1, 2022, the Appeals Council declined further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1–3).  On September 29, 2022, Canterbury

filed a complaint to obtain judicial review.  ECF Doc. 1.

---

[1] The administrative transcript appears in ECF Doc. 6.

2

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Canterbury was born on July 31, 1991; she was 26 years old on the alleged onset date and 30 years old on the date of the ALJ decision.  (Tr. 257).  Canterbury completed high school and had no specialized or vocational training.  (Tr. 303).  Canterbury had past work as a cashier, clerical proofreader, deli clerk, delivery driver, Amazon order picker, and mail clerk.  (Tr. 20–21, 45, 62–63, 65–66, 303).  However, the ALJ determined that Canterbury could not perform any of her past relevant work.  (Tr. 45).

### B.      Relevant Medical Evidence

On May 7, 2018, Canterbury visited Aultman Hospital's emergency department, reporting imbalance and delayed sensation and "mild" weakness in her right hand.  (Tr. 449, 462–63).  Her physical examination results were remarkable for obesity, 4/5 right arm strength, "mild" right arm pronator drift, and slower rapid alternating movements with the right hand.  (Tr. 443–44, 447–48, 450, 454–55, 459–60, 463–64).  CT scan results were remarkable for "suspected [left] periventricular white matter lesions."  (Tr. 475).  MRA/MRI scan results were remarkable for "[left] caudate head and periventricular restricted diffusion consistent with recent infarct."  (Tr. 476).  And carotid artery duplex ultrasound results suggested "1-39% stenosis" in the right and left internal carotid arteries.  (Tr. 469).  Canterbury was provided aspirin, atorvastatin, and lisinopril, after which she reported no further deficits.  (Tr. 439).  Canterbury was discharged in stable condition, with diagnoses of acute stroke, obesity, and hypertension.  *Id.*

On May 25, 2018, Canterbury returned to the emergency department, reporting that she fell while taking a hot shower and injured her foot.  (Tr. 419).  Prior to her fall, she reported

experiencing lightheadedness, dizziness, and a syncopal episode.  *Id.*  Canterbury was diagnosed with right foot sprain and vasovagal syncope and discharged in stable condition.  (Tr. 422).

On June 12, 2018, Canterbury visited Raymond G. Mason, MD, to establish care.  (Tr. 793).  She reported "mild remaining right arm weakness."  *Id.*  Her physical examination results were unremarkable.  *See* (Tr. 795).  Dr. Mason refilled Canterbury's medication prescriptions and referred her to physical therapy and neurology.  (Tr. 796–97).

On August 6, 2018, Canterbury visited Jayashree Sundararajan, MD, for a neurological evaluation.  (Tr. 383).  Canterbury reported that she experienced arm weakness, garbled speech, headache, imbalance, and lightheadedness for ten days after her stroke.  (Tr. 382–83).  Prior to her stroke, she reported headaches with bright spots in her visual field at least once per month.  (Tr. 383).  She also reported that she had "returned to work full time as [a] UPS manager – working 5-6.5 hours a day," but felt "fatigued at the end of the workday."  *Id.*  Her physical examination results were unremarkable.  *See* (Tr. 385–86).  Transcranial Doppler ultrasound ("TCD") scan results were remarkable for right to left shunt, which Dr. Sundararajan suspected was a small patent foramen ovale.  (Tr. 386–87).  Dr. Sundararajan ordered a follow-up ultrasound of Canterbury's lower extremities.  (Tr. 387).

Meanwhile, Canterbury received physical therapy treatment.  *See* (Tr. 798–835).  She self-discharged from physical therapy on August 7, 2018 because she accomplished the goals of therapy: (i) increase right hand strength; and (ii) regain "normal" fine motor skills and right upper extremity use.  (Tr. 799, 803, 834).

On August 15, 2018, Canterbury presented to the emergency department with dizziness, headache pain rated at 4/10 in severity, and nausea.  (Tr. 428).  Her physical examination results were unremarkable.  *See* (Tr. 429).  Imaging test results were also unremarkable.  *See* (Tr. 431,

4

435–36).  Canterbury was diagnosed with cephalgia and nonspecific dizziness and discharged in stable condition.  (Tr. 431).

On September 5, 2018, Canterbury returned to the emergency department, reporting headache pain rated at 7/10 in severity, dizziness, and upper extremity weakness.  (Tr. 548, 552).  Her physical examination results were unremarkable.  *See* (Tr. 549).  Imaging test results were also unremarkable.  *See* (Tr. 550, 555–56).  Canterbury's symptoms improved, and she was discharged in stable condition.  (Tr. 551).

On September 12, 2018, Canterbury reported to Dr. Mason that she had been diagnosed at the emergency department with "panic disorder and anxiety" but was not placed on medication.  (Tr. 781).  She reported no adverse symptoms.  *See* (Tr. 782).  Her physical examination results were remarkable for anxious appearance.  (Tr. 783).  Dr. Mason diagnosed Canterbury with anxiety and prescribed Lexapro.  (Tr. 783–84).

On October 7, 2018, Canterbury presented to the emergency department with left arm weakness, imbalance, slurred speech, and a brief episode of double vision.  (Tr. 565).  Her physical and neurological examination results were unremarkable.  *See* (Tr. 566, 569).  MRI/MRA scan results were remarkable for right pontine infarct and chronic left temporal infarcts.  (Tr. 570); *see* (Tr. 582–83).  CTA scan results were remarkable for areas of marginal irregularity, for which vasospasm and vasculitis was a "possibility."  (Tr. 580).  Canterbury was diagnosed with acute right pontine infarct, history of stroke, obesity, hypertension, and trivial atrial shunt.  (Tr. 559).  She was prescribed Plavix and discharged in stable condition, with instructions to follow up with a neurologist.  (Tr. 559–60, 568).

On November 8, 2018, Canterbury visited Anthony Furlan, MD, reporting anxiety, monthly headaches, occasional scotomas, and nausea.  (Tr. 746).  She reported that her

headaches were "moderate" in severity and would sometimes require her to lie down.  *Id.*  Her physical and neurological examination results were remarkable for "Grade 1 papilledema."  (Tr. 747–48).  Dr. Furlan diagnosed Canterbury with stroke and cerebrovascular accident due to embolism of the right vertebral artery.  (Tr. 748–49).  Dr. Furlan referred Canterbury to a neuro-ophthalmologist and instructed her to go to the emergency department if there was any increase in the frequency or severity of her symptoms.  (Tr. 749).

On January 7, 2019, Canterbury visited Michael Morgan, MD, for an evaluation into possible papilledema and retinal vasculitis.  (Tr. 743).  Canterbury reported two headaches in the previous week, each lasting between four to six hours with transient visual obscurations.  *Id.*  Her neuro-ophthalmological examination results were unremarkable.  *See* (Tr. 744–45).  Dr. Morgan found no evidence of either papilledema or retinal vasculitis.  (Tr. 745).

On January 14, 2019, Canterbury visited the emergency department, reporting headache pain rated at 9/10 in severity and dizziness.  (Tr. 484).  Her physical examination results were unremarkable.  *See* (Tr. 485–86).  CT scan results were remarkable for "[a]pparent high-grade stenosis involving the basilar artery," for which differential considerations included vasospasm and vasculitis.  (Tr. 492).  Canterbury was provided a "migraine cocktail," after which her headache resolved.  (Tr. 487).  She was diagnosed with headache, chronic cerebral infarcts, and cerebral vasculitis.  *Id.*  She was prescribed aspirin and Plavix and discharged in stable condition. *Id.*

On January 17, 2019, Canterbury returned to the emergency department, reporting a headache that she felt was similar to the one which precipitated her last visit.  (Tr. 617).  She reported as associated symptoms "spots in her vision, blurred vision and fogginess."  *Id.*  Her physical examination results were unremarkable.  *See* (Tr. 618–19).  CT scan results were

unremarkable. *See* (Tr. 623). She was provided Dilaudid, after which her headache resolved. (Tr. 619). Canterbury was prescribed Verapamil and discharged in stable condition. *Id.*

On January 22, 2019, Canterbury reported to Dr. Furlan that she had headache pain rated at 5/10 in severity, dizziness, and blurred vision. (Tr. 730). Her physical and neurological examination results were remarkable for obesity and papilledema. (Tr. 732–33). Dr. Furlan diagnosed Canterbury with headaches and prescribed ibuprofen and a Medrol Dosepak. (Tr. 733). Dr. Furlan noted his suspicion that Canterbury's symptoms were likely "atherosclerosis related," as there was "no compelling evidence for CNS or systemic vasculitis." (Tr. 734).

On February 5, 2019, Canterbury reported to Dr. Furlan that the Medrol Dosepak resolved her headache within 24 hours, but she had "fairly intense" recurring headaches. (Tr. 877). Dr. Furlan referred Canterbury for a cerebral angiogram. *Id.*

On February 6, 2019, Canterbury visited University Hospitals for a vasculitis evaluation. (Tr. 407). She reported daily headaches rated at 7/10 in severity, with blurry vision. (Tr. 411). She also reported episodes of lightheadedness, intermittent episodes of "feeling drunk," and a single episode of chest tightness and shortness of breath. *Id.* Her physical and neurological examination results were remarkable for 4+/5 right deltoid strength, mild flattening of the right nasolabial fold, and "[q]uestionable" right pronator drift. (Tr. 412–14). MRI/MRA scan results were remarkable for "[m]arked, multifocal areas of irregularity and narrowing of the anterior and posterior circulation. There is severe stenosis of the middle and distal 3rd of the basilar artery." (Tr. 417, 965–66). Cerebral angiography scan results were remarkable for "60-70% narrowing at the mid-basilar artery segment; mild narrowing in supraclinoid left ICA and distal ACA." (Tr. 407). Canterbury was diagnosed with basilar artery stenosis and prescribed prednisone and

pantoprazole.  (Tr. 407–08).  The attending physician noted that the evidence was "highly supportive of CNS vasculitis," though the cause was undetermined.  (Tr. 409).

On March 11, 2019, Canterbury reported to Dr. Mason that she hadn't had a headache since being discharged from University Hospitals.  (Tr. 772).  She reported her chief complaint as increased anxiety.  *Id.*  Her physical examination results were unremarkable.  *See* (Tr. 774–75).  Dr. Mason increased Canterbury's Lexapro dosage.  (Tr. 775).

On March 21, 2019, Canterbury visited Cathy Sila, MD, for a neurological evaluation. (Tr. 722).  Canterbury reported that she had an "event" on March 16, 2019, which lasted 10-15 minutes and during which she had speech difficulty and right extremity numbness.  *Id.*  She reported "generally doing well" otherwise and that her headaches were "much better with steroids."  *Id.*  She also reported that she continued to work at UPS but suffered from "excessive" fatigue.  *Id.*  Her physical and neurological examination results were remarkable for obesity.  *See* (Tr. 723–25).  TCD scan results were remarkable for "increased velocities on the left MCA and low velocities in the basilar system."  (Tr. 722–23).  Dr. Sila diagnosed Canterbury with cerebral vasculitis, essential hypertension, and residual cognitive deficit as late effect of stroke.  (Tr. 725). Dr. Sila refilled Canterbury's medication prescriptions for Plavix, atorvastatin, and prednisone. *Id.*

On May 28, 2019, Canterbury visited David Blumenthal, MD, for a rheumatological consultation.  (Tr. 710).  Canterbury reported that her headaches returned in April 2019, after she ran out of prednisone.  *Id.*  She reported headache pain rated at 5/10 in severity.  *Id.*  Her physical examination results were unremarkable.  *See* (Tr. 711).  Dr. Blumenthal agreed that Canterbury's presentation and past tests were consistent with primary angiitis of the central nervous system

vasculitis.  (Tr. 717).  Dr. Blumenthal refilled Canterbury's prednisone prescription and prescribed monthly cyclophosphamide injections.  *Id.*

On June 21, 2019, Canterbury visited the emergency department, reporting lightheadedness, diffuse tongue swelling, and shortness of breath.  (Tr. 651–52).  She reported that her symptoms started three days earlier.  *Id.*  Her physical examination results were unremarkable.  *See* (Tr. 651, 653–54).  CT scan results were also unremarkable.  *See* (Tr. 659).  Canterbury was discharged with a diagnosis of tongue paresthesia.  (Tr. 651).

On July 16, 2019, Canterbury reported to Dr. Blumenthal that the first cyclophosphamide injection caused nausea.  (Tr. 701).  Her physical examination results were unremarkable. *See* (Tr. 702).  Dr. Blumenthal prescribed anti-nausea medication.  (Tr. 703).

On July 18, 2019, Canterbury reported to Dr. Sila that she was "doing good" but experienced four episodes of tongue numbness, lasting four to six hours, which mostly occurred during headaches.  (Tr. 696).  Her physical and neurological examination results were unremarkable.  *See* (Tr. 698–99).  TCD scan results were remarkable for "improved velocities in MCAs (still mildly elevated) and borderline low in VB system (improved from last study)."  (Tr. 700); *see* (Tr. 975–76).  Dr. Sila refilled Canterbury's medication prescriptions.  (Tr. 700).

On September 12, 2019, Canterbury reported to Dr. Sila that she was "doing good" but had "[e]very day fatigue."  (Tr. 688).  She also reported an episode of double vision, which lasted 30 minutes, and episodes of tongue numbness.  (Tr. 68889).  Her neurological examination results were unremarkable.  *See* (Tr. 690).  Dr. Sila instructed Canterbury to obtain a sleep study if her fatigue persisted.  (Tr. 691).

On September 20, 2019, Canterbury visited the emergency department, reporting dizziness that she felt was similar to what she felt before her strokes.  (Tr. 624).  Her physical

and neurological examination results were unremarkable.  *See* (Tr. 625).  Canterbury elected to go home against medical advice, without undergoing CT examination.  (Tr. 627).

On October 3, 2019, Canterbury reported to Dr. Mason no adverse symptoms.  (Tr. 761–63).  Her physical examination results were remarkable for high blood pressure.  (Tr. 763–64).  Dr. Mason adjusted Canterbury's medication.  (Tr. 764).

On November 4, 2019, Canterbury reported to Dr. Mason that her blood pressure was better controlled but that she had a "mild lack of motivation."  (Tr. 755).  Her physical examination results were unremarkable.  *See* (Tr. 758).  Dr. Mason adjusted Canterbury's medication and recommended lifestyle changes to improve her mood.  (Tr. 758–59).

On January 9, 2020, Canterbury reported to Dr. Sila no adverse symptoms or new events.  (Tr. 680–81).  Her neurological examination results were unremarkable.  *See* (Tr. 682).  Dr. Sila stated that Canterbury was "[c]linically doing well – no recurrent TIAs."  (Tr. 683).

On April 22, 2020, Canterbury visited the emergency department, reporting that she'd had a right-sided headache for over a week.  (Tr. 666).  Her physical examination results were unremarkable.  *See* (Tr. 667).  She was provided Toradol, Decadron, Compazine, and Tylenol and discharged with diagnoses of headache and hypertension.  *Id.*

On June 18, 2020, Canterbury reported to Dr. Sila in a telehealth visit that she had no new events or headaches.  (Tr. 669–70).  She reported that she experienced right foot paresthesia during her 20-minute commute to work.  (Tr. 670).  Her virtual neurological examination results were unremarkable.  *See* (Tr. 671).  MRI/MRA scan results dated June 15, 2020 showed "interval improvements in narrowing of arteries in the anterior and posterior circulation."  (Tr. 674); *see* (Tr. 959–61).  Dr. Sila stated that Canterbury's paresthesia was possibly focal nerve compression, given its association with sitting, and recommended repositioning.  (Tr. 675).

Dr. Sila also noted that Canterbury's vasculitis was "improved in symptoms" and likely to be in remission after a complete course of therapy. *Id.*

On September 13, 2020, Canterbury returned to the emergency department, reporting that she'd had dizziness and a headache for the previous four days. (Tr. 1012, 1016). She also reported transient numbness and tingling in her left arm and mouth. (Tr. 1012). Her physical and neurological examination results were unremarkable. *See* (Tr. 1013, 1016). CT scan results were also unremarkable. *See* (Tr. 1021). Canterbury was discharged with instructions to follow up with her neurologist. (Tr. 1013).

On September 18, 2020, Canterbury reported to Dr. Mason in a telehealth visit that she woke up with a migraine that was not alleviated with ibuprofen. (Tr. 1005). Dr. Mason prescribed a high-dose ibuprofen. (Tr. 1006).

On September 24, 2020, Canterbury visited Jefferie Michael Wilhelm, NP-C, reporting recurring debilitating headaches over the previous week. (Tr. 999). She reported improvement with ibuprofen, but the headaches would recur after several hours. *Id.* Her physical examination results were unremarkable. *See* (Tr. 1002–03). Nurse Practitioner Wilhelm instructed Canterbury to follow up with her neurologist. (Tr. 1003).

On October 20, 2020, Canterbury reported to Nurse Practitioner Wilhelm that her migraines resolved after she was prescribed propranolol by her neurologist. (Tr. 994). Her physical and neurological examination results were unremarkable. *See* (Tr. 997).

On January 7, 2021, Canterbury reported to Dr. Sila that she'd felt numbness in her left fingertips two weeks before the appointment and intense dizziness five days before the appointment. (Tr. 857, 859). She reported that she felt her speech had changed, but it went unnoticed by others. (Tr. 859). She also reported starting a new job with Amazon. *Id.* Her

11

physical and neurological examination results were unremarkable.  (Tr. 860).  Dr. Sila stated that

Canterbury was "doing well" one year after completing therapy and ordered an MRI/MRA to

evaluate for new strokes.  (Tr. 857).

On May 3, 2021, Canterbury visited Dr. Sila to review her MRI/MRA scan results.  (Tr.

1075).  Dr. Sila stated that "tests are stable still with the narrowing but management is the same

Aspirin/Plavix as well as healthy lifestyle diet and exercise."  (Tr. 1075); *see* (Tr. 1066–69).

### C.    Relevant Opinion Evidence

### 1.    Consultative Examiner – Tawnee Tanner, PsyD

On October 22, 2020, Canterbury attended a telehealth appointment with Tawnee Tanner,

PsyD, for a psychological evaluation.  (Tr. 850).  Canterbury reported that she experienced

dizziness and headache pain "every day or every other day."  (Tr. 851).  She also reported:

(i) occasional difficulty with concentration, memory, and verbal/written expression; (ii) "very

bad" memory and "poor" focus and concentration, barely being able to remember what she did

the day before; (iii) lifelong anxiety, which increased after her strokes; (iv) three panic attacks

while at work, with the most recent one occurring two weeks before the appointment; (v) that she

was irritable and easily saddened; (vi) poor motivation; (vii) trouble going out in public;

(viii) feeling tired throughout the day; and (ix) inconsistent sleep.  (Tr. 851–52).

With respect to her employment, Canterbury reported that she worked part-time (12

hours) at a UPS store, where she had worked for 3 years.  (Tr. 852).  She reported that she used

to work more hours, but she felt she "could not do it" after her stroke and that her current hours

were "still too much at times."  *Id.*  She also reported that she: (i) experienced multiple panic

attacks, even with reduced hours; (ii) struggled with decision making; (iii) could not retain

directions; (iv) worked slower than before; (v) was easily fatigued and struggled with typing

especially; (vi) struggled with anxiety and irritability when dealing with customers, "scream[ing]" before customers entered; and (vii) struggled with motivation to arrive to work on time.  *Id.*  In discussing her activities of daily living, Canterbury reported that she usually "just sits around" and occasionally watched television.  *Id.*  Canterbury reported that she could prepare her own meals, but her girlfriend did "pretty much everything."  *Id.*

On mental status examination, Canterbury struggled to recall words or events and exhibited anxious mood.  (Tr. 852–53).  Dr. Tawnee opined that:

(i)     Canterbury was "likely to experience limitations in comprehension, recall, and task completion due to increased mental health symptoms, as well as in relation to experiencing multiple strokes."

(ii)    Canterbury was "likely to experience reduced effectiveness [maintaining attention and concentration, maintaining persistence and pace, performing simple tasks, and performing multi-step tasks] when depressive or anxious symptoms increase, particularly in fast-paced stressful environments where [Canterbury] is expected to work quickly."

(iii)   Canterbury "may experience difficulties at times with interpersonal interactions due to increased anxiety or irritability, particularly with individuals she is unfamiliar with, or in situations where she feels criticized or judged."

(iv)    Canterbury was "likely to struggle with management of her stress and anxiety currently."

(Tr. 853–54).

### 2.     Treating Source – Cathy Sila, MD

On June 15, 2021, Dr. Sila signed a four-page "physical Medical Source Statement," which asked Dr. Sila to answer questions regarding Canterbury's physical functional limitations. (Tr. 1071–74).  Dr. Sila listed Canterbury's diagnoses and symptoms but left blank all the questions which asked Dr. Sila to specify functional limitations.  *See id.*

The form also asked Dr. Sila to describe any environmental or psychological limitations that would affect Canterbury's ability to work.  (Tr. 1074).  Dr. Sila answered: "See attached.  If formal work performance eval[uation] is needed, please authorize such with physical therapy assessment."  *Id.*  Attached to Dr. Sila's medical source statement were her treatment notes from June 18, 2020, January 7, 2021, and May 5, 2021 and MRI/MRA scan results dated April 26, 2021.  (Tr. 1091–94).

### 3.    State Agency Mental Health Consultants

On November 1, 2020, psychologist Jennifer Swain evaluated Canterbury's mental capacity based on a review of the medical record.  (Tr. 115–16).  Swain opined that:

(i)     Canterbury would have "[m]oderate memory limitations," such that she was "[c]apable of understanding and remembering simple instructions."

(ii)    Canterbury's symptoms were "likely to negatively impact [her] ability to maintain [concentration/persistence/pace]," such that she was "[c]apable of completing simple tasks that do not require fast pace or high production quota."

(iii)   Canterbury was "[a]ble to engage in superficial contact from the general public, coworkers, and supervisors."

(iv)    Canterbury's mental health symptoms were "likely to be exacerbated by work stressors," such that she was "[c]apable of working in a static/routine environment."

*Id.*  On April 29, 2021, David Dietz, PhD, concurred with Swain's opinion.  (Tr. 133–34).

### D.    Function Report

On September 2, 2020, Canterbury reported on her daily functioning.  *See* (Tr. 315–22).  She reported that her day consisted of waking up, taking medicine, going back to sleep, and going to work.  (Tr. 316).  She reported that her only hobby was watching television for up to three hours.  (Tr. 319).  Her social activities consisted of being on her phone, texting, and video chatting.  *Id.*

14

Canterbury reported that she received assistance to dress, bathe, shave, and use the toilet. (Tr. 316). She reported needing reminders to take medicine and encouragement to do certain chores. (Tr. 317–18). She reported that she could prepare "easy" meals once per week and "some laundry and light cleaning" once per week. *Id.* She also reported that she went outside three times per week to go to work and could drive. (Tr. 318–19).

Canterbury reported that, because of her impairments: (i) she forgot what she was doing; (ii) she was tired constantly and needed to sit frequently; (iii) she needed to breathe and often screamed before customers walked into the store; (iv) she could lift up to 30 pounds and walk for up to 30 minutes; and (vi) she could not kneel or bend. (Tr. 315, 320). She reported her ability to instructions as "semi good" and ability to get along with authority figures as "good." (Tr. 320). She reported that she handled stress and changes in routine "not good." (Tr. 321).

### E.      Third-Party Statement

On May 28, 2021, Angelique Rebekah Curtis, Canterbury's girlfriend, reported on Canterbury's daily functioning. *See* (Tr. 349–56). Curtis reported that Canterbury's daily activities consisted of drinking coffee, catching up on emails, watching television, napping, and showering with a shower chair. (Tr. 349–50). Curtis reported that Canterbury's hobbies consisted of watching television, coloring, and diamond painting. (Tr. 353). And Curtis reported that Canterbury received guests a few times per month, during which they watched television. *Id.*

Curtis reported that she assisted Canterbury with shaving her legs, reminders to take medication and do laundry, and cooking. (Tr. 350–51). Curtis reported that Canterbury could do laundry, give water to their cat, sit down and fold clothes, and run the dishwasher. (Tr. 351). Curtis reported that Canterbury could also drive and shop remotely and went outside "4-5 times."

15

(Tr. 352).  Curtis further reported that Canterbury: (i) was easily fatigued; (ii) often forgot recipes and purchases she had made; (iii) could not stand or walk for prolonged periods of time; (iv) could walk 30-45 minutes before needing to rest, after which she could walk 20-30 minutes; (v) was aggravated with stress and did not handle changes in routine well; and (vi) could follow written instructions "[f]airly well unless they were long."  (Tr. 349, 351–55).

### F.  Relevant Testimonial Evidence

#### 1.  Canterbury

Canterbury testified at the administrative hearing that she last worked as a delivery driver for Door Dash from August to December 4, 2021.  (Tr. 62–63).  She testified that she stopped because she got "dizzy" and could no longer drive.  (Tr. 62).  She testified that she left her prior job as a deli worker because of anxiety and her job as a pet groomer because of dizziness.  (Tr. 63–64).  She testified that she did not work full-time for Amazon, despite earning over $8,000 between November 2020 and January 2021.  (Tr. 64–65).  She testified that she: (i) worked "maybe … one to two days and then I . . . use[d] my vacation days because I couldn't do the amount of work that they expected me to do"; and (ii) earned "one or so" vacation days and "PTO."  *Id.*  She testified the Amazon job required her to stand the whole shift.  (Tr. 65).  She testified that she worked as a mail clerk for ten hours per week before joining Amazon, of which she spent the entire time sitting down.  (Tr. 66).  She testified she left for Amazon as an attempt to work.  *Id.*

Canterbury testified that she experienced daily headaches, which lasted two hours and affected her vision.  (Tr. 67–68).  She testified that she spent those two hours lying down and waiting for the headache to pass.  (Tr. 68).  She testified that she had occasional weakness and constant numbness in her right hand, which caused issues with loading the dish washer, doing

16

laundry, and holding a pencil.  (Tr. 67–69).  She testified that she experienced vertigo and a "passing out" sensation every day.  (Tr. 69–70).

Canterbury testified that on bad days, which occurred two to three times per week, she did not want to get out of bed.  (Tr. 70–71).  She testified that "can't remember anything" from yesterday and often took long pauses to figure out what words to say.  *Id.*  She testified that she could not read because would reread the same page over and over again.  (Tr. 71).  She testified that she was constantly anxious, depressed, and without energy.  *Id.*  And she testified that she last had a panic attack three to four months before the hearing.  (Tr. 72–73).

### 2.    Vladimir V. Karpitskiy, MD, PhD

Medical expert, neurologist Vladimir V. Karpitskiy, MD, PhD, testified that he reviewed the medical record and listened to Canterbury's testimony.  (Tr. 74); *see* (Tr. 1164 (credentials)). Based on that review, Dr. Karpitskiy opined that Canterbury did not meet criteria of Listing 11.04.  (Tr. 74–75).  He testified that Canterbury would otherwise have "no[] greater limitations" stemming from a neurological medical impairment.  (Tr. 75).  In expanding upon his opinion, Dr. Karpitskiy made reference to Dr. Sila's treatment notes reflecting Canterbury's scores on the Modified Rankin Scale for Neurologic Disability and Barthel Index for Activities of Daily living. (Tr. 75–76 (citing Tr. 860, 868, 908)).

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the

relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks

omitted), even if a preponderance of the evidence might support the opposite conclusion.

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's

decision will not be upheld when the ALJ failed to apply proper legal standards and the legal

error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor

will the court uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d

875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.      Threshold Matter

There is an issue with Canterbury's briefing that warrants preliminary attention.  The

court's initial order required Canterbury to enumerate the specific legal issues to be decided.

ECF Doc. 4 at 4.  Although the first page of Canterbury's opening brief enumerated three issues,

her first issue statement challenges the ALJ's handling of four different medical opinions.  ECF

Doc. 7 at 1.  And her second issue statement challenges the ALJ's finding at Step Two that her

vasculitis was not "severe" and the ALJ's failure to address at Step Three whether she met

Listing 14.03.  *Id.*

Lumping issues together in this manner creates ambiguity as to what claims are actually

at issue.  The court is left to parse out plaintiff's actual claims from tangential points that are not

fully developed.  And it creates the potential for issues that Canterbury intended to raise to be

forfeited, because "issues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argument, are deemed [forfeited].  It is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v.

Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal quotation marks omitted).  Nor is it the

18

court's role to "hunt for truffles that might me buried" in the record or the parties' briefs. *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011).

As discussed below, forfeiture for lack of development affects several of Canterbury's issues on judicial review.  Although forfeiture would be a sufficient basis for disposition of those issues, I have separately considered their merit and determined that no basis for remand exists regardless.

### C.    Step Two – Vasculitis as a Non-Severe Impairment[2]

Canterbury's initial brief challenges the ALJ's Step Two finding that her vasculitis impairment was not "severe."  ECF Doc. 7 at 16.  Here is Canterbury's full argument on that issue: "The medical evidence in this matter clearly established that Canterbury's vasculitis was a severe impairment which affected her ability to work."  ECF Doc. 7 at 17.  The Commissioner disagrees.  ECF Doc. 8 at 8–9.  Even though such a claim should be deemed forfeited for lack of development, I will analyze the contention.

At Step Two of the sequential evaluation process, a claimant must show that she has *at least one* "severe" medically determinable impairment.  20 C.F.R. § 404.1520(a)(4)(ii), (c); SSR 85-28, 1985 SSR LEXIS 19, at *7–8 (1985).  If the claimant does not meet this Step Two burden, the claimant is categorically *not* disabled.  20 C.F.R. § 404.1520(c).  But if she does, the ALJ must consider all *all of her impairments* (even those that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009).  And so long as the ALJ considered all the claimant's impairments in the other steps, any Step Two error is harmless.  *Id.* at 577.

---

[2] For ease of analysis, the disparate arguments scattered across the first and second argument subsection in Canterbury's brief are reorganized to fit within the five-step analytical framework for Social Security cases.

Canterbury's challenge to the ALJ's Step Two finding that her vasculitis impairment was nonsevere does not a establish a basis for remand.  For one, the argument is forfeited for lack of development.  *McPherson*, 125 F.3d at 995–96.  For another, the ALJ considered Canterbury's vasculitis impairment multiple times at later steps in the sequential evaluation process.  *See Nejat*, 359 F. App'x at 577.  At Step Three the ALJ considered whether Canterbury's vasculitis impairment met or equaled Listing 11.04 (vascular insult to the brain).  (Tr. 23).  The ALJ considered the cognitive deficits Canterbury attributed to her vasculitis in determining whether her mental health impairments met or equaled Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  (Tr. 23–26).  And at Step Four, the ALJ separately considered the extent to which the medical and non-medical evidence supported any RFC limitations associated with Canterbury's vasculitis or her alleged associated symptoms.  *See* (Tr. 28–45).

I recommend Canterbury's Step Two challenge be rejected.

### D.    Step Three – Listing 14.03A

Canterbury argues that the ALJ erred by not evaluating whether Canterbury met or equaled the criteria of Listing 14.03A (systemic vasculitis).  ECF Doc. 7 at 17; ECF Doc. 9 at 1.  Canterbury argues that she meets the Listings 14.03A criteria because she has: (i) inflammation of the blood vessels; (ii) involvement of two body systems (the mental and neurological systems); (iii) her neurological system involved at least a moderate level of severity; and (iv) she had two constitutional symptoms or signs (fatigue and malaise).  *See* ECF Doc. 7 at 17–19.  The Commissioner disagrees.  ECF Doc. 8 at 9–10.

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in

20

20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e).  However, the ALJ "need not discuss [L]istings that the [claimant] clearly does not meet, especially when the claimant does not raise the [L]isting before the ALJ."  *Sheeks v. Comm'r of SSA*, 554 F. App'x 639, 641 (6th Cir. 2013).  But if "the record raises a substantial question as to whether the claimant could qualify as disabled under a [L]isting, the ALJ should discuss that [L]isting."  *Id.*  A substantial question exists when the claimant "point[s] to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the [L]isting."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).

Listing 14.03 establishes the automatic-disability criteria for systemic vasculitis, i.e., an autoimmune disorder which causes inflammation of the blood vessels.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 14.03.  To meet the Listing 14.03A, the claimant must have an angiography or tissue biopsy which confirms a diagnosis of systemic vasculitis and show:

> A.  Involvement of two or more organs/body systems, with:
>
>> 1. One of the organs/body systems involved to at least a moderate level of severity; and
>>
>> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

*Id.* § 14.03 (cross-referencing Listing 14.00D2).  "Severe fatigue" is defined as a "frequent sense of exhaustion that results in significantly reduced physical activity or mental function."  *Id.* § 14.00C2.  "Malaise" is defined as "frequent feelings of illness, bodily discomfort, or lack of well-being that results in significantly reduced physical activity or mental function."  *Id.*  The constitutional signs and symptoms must be connected to the claimant's autoimmune disorder.

*See Burch v. Saul*, No. 20-cv-73, 2021 U.S. Dist. LEXIS 112296, at *13–14 (W.D. Ky. June 15, 2021).

Canterbury has not met her burden to raise a substantial question about whether she meets all of the criteria for Listing 14.03A.  *Smith-Johnson*, 579 F. App'x at 432.  There is no dispute that Canterbury could reasonably satisfy the diagnostic criteria for Listing 14.03A.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 14.00D2b (requiring only that systemic vasculitis be suspected clinically); *see* (Tr. 409, 492, 580, 966); *see also* (Tr. 725, 977).  However, Canterbury has cited no evidence to support her one-sentence argument that her vasculitis involved her mental system.  *See* ECF Doc. 7 at 17–18.  She has not attempted to argue in what way that involvement arose to the level of a "moderate level of severity."  20 C.F.R. pt. 404, Subpt. P., App. 1 § 14.03A1; ECF Doc. 7 at 17–18.  And she has not attempted argue in what way the medical record establishes that her fatigue and malaise resulted in "significantly reduced physical activity or mental function."  20 C.F.R. pt. 404, Subpt. P., App. 1 § 14.00C2.  As the party with the burden, these omissions are fatal to Canterbury's Step Three challenge.  *Smith-Johnson*, 579 F. App'x at 432; *McPherson*, 125 F.3d at 995–96; *cf. Anna H. v. Kijakazi*, No. 20 CV 7137, 2022 U.S. Dist. LEXIS 178804, at *10 (N.D. Ill. Sept. 30, 2022); *Vidot v. Colvin*, No. 1:14-cv-01343, 2015 U.S. Dist. LEXIS 79200, at *14 (N.D. Ohio May 13, 2015), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 79201 (N.D. Ohio June 18, 2015).

Moreover, the ALJ credited Dr. Karpitskiy's opinion and found that none of Canterbury's subjective symptom complaints were attributable to her neurological impairments and that her claimed associated symptoms (including fatigue) caused "no significant functional limitations in [her] ability to do basic physical or other work-related activities."  (Tr. 41); *see Burch*, No. 20-

cv-73, 2021 U.S. Dist. LEXIS 112296, at *13–14.  As discussed below, those findings were consistent with the regulations and supported by substantial evidence.

I recommend that Canterbury's Step Three claim regarding Listing 14.03A be rejected.

### E.       Step Four – Opinion Evidence

Canterbury argues that the ALJ committed several errors in her evaluation of the opinion evidence.  She argues that the ALJ failed to adopt or explain the basis for rejecting the state agency consultants' opinion of her mental health-related limitations.  ECF Doc. 7 at 11.  She argues that the ALJ failed to include any of Dr. Tanner's proposed limitations into the RFC or infer limitations from Dr. Sila's medical source statement.  *See* ECF Doc. 7 at 12–16.  And she argues that the ALJ's evaluation of Dr. Karpitskiy's opinion failed to address the contrary evidence establishing the severity of her neurological impairments.  *See* ECF Doc. 15–16.  The Commissioner disagrees.  *See* ECF Doc. 8 at 11–15.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a).  The ALJ must, at minimum, explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[3].  And when an ALJ finds persuasive some parts of a medical opinion and not others, she must explain why the parts of the opinion which conflict with her RFC findings were not adopted.  *See Davis v.*

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

*Comm'r of Soc. Sec.*, No. 5:20-cv-2807, 2021 U.S. Dist. LEXIS 244915, at *29 (N.D. Ohio Nov. 24, 2021) (citing SSR 96-8p, 1996 SSR LEXIS 5 at *7 (July 2, 1996).

### 1.    State Agency Consultants

Canterbury has not developed an argument about how the ALJ's RFC finding failed to accommodate the state agency consultants' opinion on her mental health-related functional limitations.  *See McPherson*, 125 F.3d at 995–96; *see also Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("[The ALJ] is not required to recite the medical opinion of a physician verbatim in his [RFC] finding.").  Nevertheless, a comparison between their opinions and the RFC confirms that they are fully accounted for.

The ALJ's RFC finding limiting Canterbury to "simple, routine tasks in an environment that involves no high production quotas or fast-paced production demands" accounted for the state agency consultants' opinion that she could understand and remember simple instructions and complete simple tasks that did not require a fast pace or a high production quota.  *Compare* (Tr. 27), *with* (Tr. 115, 133); *see also Caldwell v. Comm'r of Soc. Sec.*, No. 3:19 CV 1909, 2020 U.S. Dist. LEXIS 228053, at *35 (N.D. Ohio Aug. 17, 2020) (finding that a restriction to "simple, routine tasks" accommodated some restriction against detailed instructions), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 228041 (N.D. Ohio Dec. 4, 2020); *Hammett v. Comm'r of Soc. Sec.*, No. 2:16-cv-12304, 2017 U.S. Dist. LEXIS 147360, at *12–13 (E.D. Mich. Aug. 15, 2017) (finding that a restriction to "simple, routine tasks" accommodated "marked limitations" in the ability to understand and remember complex instructions), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 146914 (E.D. Mich. Sept. 12, 2017).

The state agency consultants' opinion that Canterbury could only engage in "superficial contact" with others was accommodated by the ALJ's RFC finding limiting Canterbury to "no

tasks involving customer service duties, confrontation, conflict resolution including arbitration and negotiation, negotiation, directing the work of others or persuading others, or tandems tasks, defined as tasks that would require the joint or cooperative effort of a coworker to complete theme . . . ." *Compare* (Tr. 27), *with* (Tr. 116, 134).  This is because "superficial interaction," while referring to the quality of interactions, has no specific vocational definition.  *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-cv-02370, 2022 U.S. Dist. LEXIS 43108, at *49–50 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 43045 (N.D. Ohio Mar. 10, 2022).  And the ALJ accommodated the state agency consultants' opinion that Canterbury could work in a "static/routine environment" when she limited her to "few" workplace changes, which happen only occasionally and are implemented gradually.  *Compare* (Tr. 27), *with* (Tr. 116, 134); *see also Torres v. Comm'r of Soc. Sec.*, No. 1:20-cv-1186, 2021 U.S. Dist. LEXIS 153376, at *46–47 (N.D. Ohio Aug. 16, 2021) (concluding similarly).

Thus, I find no basis for remand on account of Canterbury's argument that there was an inconsistency between the ALJ's RFC finding failed to account for the opinion of the state agency consultants.

### 2.    Dr. Tanner

The ALJ's evaluation of Dr. Tanner's opinion was consistent with the regulations, and her findings were supported by substantial evidence.  42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405.  In evaluating Dr. Tanner's opinion, the ALJ stated:

> Dr. Tanner's opinion is generally persuasive insofar as it expresses some likely, considered as significant (more than mild) in favor of [Canterbury], limitations caused by depressive and anxiety disorders in the four areas of work-related mental functioning, and where so specified (albeit not well-defined phrasing) environments with fast pace or specific types of social interactional situations.  To such extent, her opinion was fairly well supported by her appropriate consideration of symptoms, including the three on-the-job panic attacks experienced, and they are fairly consistent with the collateral medical evidence of

25

record that does contain some (albeit few) presenting complaints to her primary care physician and to her neurologist about anxiety and work-related stressors and the prescription for Lexapro medication.  However, no greater than moderate degree of expected limitations would be inferable for Dr. Tanner's rather vaguely phrased opinion, when considering the numerous citations to unremarkable findings about the claimant's social presentation with herself, and unfamiliar individual, and no deficits clinically observed in memory abilities (*e.g.*, did not actually need to have any instructions repeated) or in maintaining adequate attention and concentration during the interview, without signs of distraction by ambient sounds (Ex. 6F/4,5).

(Tr. 43–44) (emphasis omitted).

The ALJ's analysis reflects that the ALJ considered the degree to which Dr. Tanner's clinical findings supported her opinion (supportability) and the extent to which her opinion was consistent with Canterbury's presentation to other medical providers and treatment for anxiety (consistency).  20 C.F.R. § 404.1520c(c)(1)-(2).  Both findings were also supported by substantial evidence.  Earlier in her Step Four analysis, the ALJ remarked on the specific unremarkable findings in Dr. Tanner's examination she found consistent with a "moderate degree" of limitations.  (Tr. 39 (citing (Tr. 852–54)).  And the ALJ discussed the specific, limited instances when Canterbury reported anxiety and depression symptoms and the course of her treatment.  (Tr. 37–38 (citing (Tr. 385, 412, 418, 431, 551, 563, 671, 731–33, 746–48, 753–58, 762, 764, 768, 770, 772, 775, 781, 784, 790–91, 794, 860, 991–92, 996, 1002–03, 1006)).

Canterbury argues that it was error for the ALJ not to include Dr. Tanner's proposed functional limitations.  ECF Doc. 7 at 11–12.  However, as the ALJ noted, Dr. Tanner's opinion did not set forth concrete functional limitations.  (Tr. 43–44).  By finding the opinion persuasive, the ALJ was therefore required to convert Dr. Tanner's opinion "into vocationally relevant [RFC] findings."  *Tucker v. Berryhill*, No. 3:16-cv-1337, 2017 U.S. Dist. LEXIS 207473, at *14 (M.D. Tenn. Dec. 18, 2018).  The ALJ complied with that requirement when she articulated the specific functional limitations she found consistent with Dr. Tanner's "moderate limitations."

26

(Tr. 39–40). And Canterbury has not attempted to establish in what other way Dr. Tanner's opinion should have been interpreted. *See McPherson*, 125 F.3d at 995–96

Thus, I find no basis no basis for remand based on Canterbury's challenge to the ALJ's evaluation of Dr. Tanner's opinion.

### 3. Dr. Sila

The ALJ committed no error when she found that Dr. Sila's June 15, 2021 medical source statement was not an "opinion" under the regulations.[4] The regulations require that an ALJ consider every medical opinion in the record and to determine its persuasive value based on the relevant factors. *See* 20 C.F.R. § 404.1520c(a). However, not every utterance of a physician constitutes a "medical opinion" under the regulations. The regulations instead define a "medical opinion" as "a statement . . . about what [the claimant] can still do despite [her] impairment(s) and whether [she has] one or more impairment-related limitations or restrictions" in her ability to meet the demands of work. 20 C.F.R. § 404.1513(a)(2). Dr. Sila left blank the portions of the medical source statement in which she could have conveyed the functional limitations resulting from Canterbury's vasculitis and cerebrovascular accident diagnoses. (Tr. 1071–74). Dr. Sila did not articulate whether any functional limitations were meant to be drawn from the treatment notes she attached to the medical source statement. And Canterbury has not argued in what way the information in Dr. Sila's treatment notes constituted a medical opinion. *See McPherson*, 125 F.3d at 995–96

Thus, I find no basis for remand based on Canterbury's challenge to the ALJ's evaluation of Dr. Sila's opinion.

---

[4] Because I find that Dr. Sila's medical source statement was not a "medical opinion" under the regulations, I do not address the ALJ's alternative consistency and supportability analysis. *See* (Tr. 42).

### 4. Dr. Karpitskiy

Last, the ALJ's evaluation of Dr. Karpitskiy's opinion complied with the regulations and was supported by substantial evidence.  42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405.  The ALJ found "generally persuasive" Dr. Karpitskiy's opinion that Canterbury's neurological impairments did not cause any significant limitations in her ability to perform work-related tasks:

> . . . Dr. Karpitskiy had available to him the entire body of written medical evidence and other evidence, and he also listened to [Canterbury's] testimony at the hearing.  He offered multiple citations to the "scales and scores" and the successful chemotherapy infusions for vasculitis he referenced for supporting his opinion.  The following expansive analysis of all relevant objective medical findings, statements from [Canterbury] made in connection with seeking medical evaluation and treatment for all symptoms, a very conservative course of essentially maintenance medication-management through neurology specialty both prior to and after the more significant treatment of chemotherapy infusions over the latter half of year 2019, and other factors also lend strong supportability to Dr. Karpitskiy's core opinion for no significant limitations resulting from the neurological disorders.  Bolstering supportability and consistency, which is equally strong based on there being no additional medical evidence provided after the date of the hearing, Dr. Karpitskiy has been a board-certified neurologist (and psychiatrist) for many years, and he carries a highly relevant subspecialty in vascular neurology (*see* Ex. 15F).

(Tr. 30).  The ALJ's analysis reflects that she considered the consistency and supportability regulatory factors.  20 C.F.R. § 404.1520c(c)(1)-(2).  And the ALJ articulated how she considered the consistency and supportability regulatory factors.  20 C.F.R. § 404.1520c(b)(2); (Tr. 30–36).

The ALJ's reasons for crediting Dr. Karpitskiy's opinion were also supported by substantial evidence.  Dr. Karpitskiy's testimony corroborates the ALJ's finding that he supported his opinion by citing unremarkable results on functional rating scales, successful chemotherapy infusions, and a lack of treatment consistent with the severity of Canterbury's claimed functional limitations.  (Tr. 75–78, 79); *see also* (Tr. 35–36).  And in the pages subsequent to the ALJ's persuasiveness finding, the ALJ discussed and cited substantial evidence

to support her consistency finding.[5]  *See* (Tr. 31–36).  Canterbury cites her own subjective symptom complaints and medical findings in the record, which she contends supported a different conclusion than that reached by the ALJ.  *See* ECF Doc. 7 at 11–16.  But because substantial evidence supported the conclusion reached by the ALJ, we must affirm even if Canterbury could point to a preponderance of the evidence which goes the other way.  *See O'Brien*, 819 F. App'x at 416.

I recommend that all of Canterbury's Step Four claims regarding the handling of the opinion evidence be rejected.

### F.       Step Four – Subjective Symptom Complaints

Canterbury argues that the ALJ failed to apply proper legal standards in evaluating her subjective symptom complaints regarding her neurological and mental health-related impairments.  She argues that the ALJ gave no supporting rationale for rejecting her subjective symptom complaints.  ECF Doc. 7 at 23–24.  She argues that the ALJ failed to cite substantial evidence to support her decision.  *Id.*  And she argues that the medical and non-medical evidence in the record supported her subjective symptom complaints.  ECF Doc. 7 at 19–23.  The Commissioner disagrees.  ECF Doc. 8 at 16–20.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant and other evidence.  20 C.F.R. § 404.1520(e).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5, at *14 (July 2, 1996).  Relevant evidence includes a claimant's medical history,

---

[5] The specific evidence which supports the ALJ consistency finding is discussed in connection with Canterbury's challenge to the ALJ's subjective symptom complaint analysis, because the ALJ's analysis of the two issues overlap.

medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5, at *13–14.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 649, 475–76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016). If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The ALJ applied proper legal standards in her evaluation of Canterbury's subjective symptom complaints. 42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405. Contrary to Canterbury's argument, the ALJ gave specific reasons for rejecting her subjective symptom complaints and cited substantial evidence to support those reasons. Over the course of 10 pages, the ALJ addressed each of Canterbury's subjective symptom complaints individually and explained the evidentiary basis for her conclusion that they were not entirely consistent with the medical evidence. *See* (Tr. 27–42).

The ALJ first considered Canterbury's symptoms of constant extremity numbness and weakness. The ALJ found that the alleged severity of Canterbury's numbness and weakness was inconsistent with: "the objective medical evidence, the lack of evaluation or treatment, and her own statements made to neurologists and other medical sources dating back to the June-August 2018 course of highly successful physical therapy." (Tr. 32). To support that conclusion, the

30

ALJ cited: (i) physical therapy notes reflecting that Canterbury denied problems with her upper right extremity after completing treatment; (ii) Canterbury's infrequent subjective symptom complaints of weakness or numbness to providers from 2019 to 2021, with no symptoms reported in her May and June 2021 visits; and (iii) the lack of treatment for weakness or numbness after her physical therapy visit. *Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 U.S. Dist. LEXIS 244271, at *30 (N.D. Ohio Dec. 22, 2021) ("the regulations do not require the ALJ to prove a negative"); (Tr. 31–32) (contrasting (Tr. 496, 857, 859) with (Tr. 669–76, 680–83, 688–91, 698–700, 857–60, 918)).

The ALJ next considered Canterbury's dizziness and lightheadedness, finding that:

> The frequency of such visits and the comparatively numerous primary care and neurological reports showing denied or at least unreported symptoms are not proportionate with her alleged constancy of them in her testimony, the mostly passing episodes are not consistent with their alleged effect on functioning for any significant period, and ultimately the medical expert's testimony that the treatment history and objective evidence does not substantiate a connection between these symptoms and the diagnosis of cerebral vasculitis in the setting of s/p two CVAs is well supported by the neurologists' and other medical sources' impressions and no offering of any medication(s) or other treatment, which she has confirmed to be still the case in her testimony.

(Tr. 33).  The ALJ cited to support her conclusions: (i) the substantial number of treatment notes in which Canterbury did not report dizziness or lightheadedness; (ii) unremarkable objective exam findings, reflecting no clinical signs of imbalance or vestibular disturbance; and (iii) the lack of specific treatment to address either symptom complaint.  (Tr. 32–33 (citing (Tr. 411–13, 418–19, 428–31, 548–51, 624–30, 644–47, 651–59, 670, 681, 724, 731–32, 743–46, 748, 755–56, 762, 766, 773, 778, 782, 786, 790, 794, 857, 859–60, 918, 991, 994–96, 1005, 1012–13)).

The ALJ also considered Canterbury's headache pain, which she described as constant and at times severe enough to require her to lie down for up to two hours.  The ALJ found that the frequency and severity of her headaches was inconsistent with the majority of treatment notes

in which she denied headaches during office visits, treatment notes reflecting effective relief with medication, and the lack of objective evidence on the degree to which her headaches were debilitating.  (Tr. 34).  In support, the ALJ cited treatment notes throughout the period under adjudication in which Canterbury denied headache pain and reported effective management of her headaches with propranolol.  (Tr. 33–34 (citing (Tr. 411, 484–86, 617–19, 625, 666–67, 670, 681, 688, 710, 717, 722, 730, 743–46, 756–57, 762, 766, 773, 782, 786, 790, 857, 994, 1005, 1012)).

With respect to Canterbury's fatigue, the ALJ implicitly concluded that the medical record did not support the frequency or severity of Canterbury's subjective symptom complaints.  *See* (Tr. 34-35).  In support, the ALJ contrasted the number of treatment notes reflecting subjective symptom complaints of fatigue with the majority of treatment notes through the end of the period under adjudication which did not.  *See id.* (contrasting (Tr. 383, 688, 722) with (Tr. 670-71, 681, 683, 756-57, 762, 782, 786, 790, 794, 859, 991, 996, 999, 1005, 1026, 1038)).  The ALJ concluded that Canterbury's mental health-related subjective symptom complaints were inconsistent with: (i) the conservative course of treatment employed for her anxiety (limited to medication treatment by a primary care physician); (ii) the lack of subjective reporting of mental health-related deficits in the majority of treatment notes throughout the period under adjudication; and (iii) unremarkable mental status exam findings.  *See* (Tr. 37–39).

And relevant to all of Canterbury's impairments, the ALJ found her subjective symptom complaints inconsistent with the activities she engaged in throughout the period under adjudication: (i) Canterbury's report to treatment providers that she worked near full-time as a manager at UPS and ability to sustain employment with UPS for two years despite her impairments; (ii) Canterbury's report to Dr. Sila in June 2020 that UPS was increasing her job

responsibilities; (iii) Canterbury's quarterly earnings from Amazon, which reflected that she earned between $3,000 and $5,350 from November 2020 to January 2021, despite her testimony that she never worked a full day, but made money from "vacation days" and paid time-off; and (iv) she and her partner's reports of her ability to drive regularly, shop online, and do light cleaning and laundry tasks.  (Tr. 40–41 (citing 316–19, 349–55, 296, 383, 667, 859)); *see also* (Tr. 62, 64–65).

A review of the ALJ decision confirms that the ALJ gave reasons for partially discounting Canterbury's subjective complaints.  The summary of the ALJ's findings above also reflects that the ALJ cited substantial evidence to support her conclusions.  Canterbury's only counterargument is that the evidence supported the opposite conclusion.  *See* ECF Doc. 7 at 19-23.  The argument amounts to little more than a request for us to reweigh the evidence in her favor, which we cannot do.  *Jones*, 336 F.3d at 476.  Because substantial evidence supports the ALJ's decision, we must affirm even in the face of a preponderance of the evidence to support the opposite conclusion.  *O'Brien*, 819 F. App'x at 416.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Canterbury's applications for DIB and SSI be affirmed.

Dated: April 26, 2023

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).